Thank you, your honor. Good afternoon and may it please the court. My name is Amy Spencer and I represent the petitioner appellant, Raymond Valas, and I'd like to reserve five minutes for rebuttal. Thank you. This case presents this court with an opportunity to ensure that in this circuit, the right to a unanimous verdict, the government's duty to abide its constitutional obligations, and the right to constitutionally effective counsel at every stage of the process are real, safeguarding the integrity of the criminal justice system. Because separately and cumulatively, there was a genuine risk Mr. Valas was convicted by a non-unanimous jury, as this court recognized on direct appeal, his trial counsel failed to cross-examine the government's key witness using the only objective evidence available to raise reasonable doubt about the truthfulness of her allegations. The government suppressed a prior statement of its key witness that was materially inconsistent in the details of her allegations, and his trial counsel allowed the government to commit prosecutorial misconduct without objection, when in closing, the AUSA repeatedly assured the jury that the accuser was telling the truth. This court should grant Mr. Valas' habeas petition and the unanimity issue. As this court rightly recognized on direct appeal, 822F3, 228, 237 Note 2, there's a genuine risk that Mr. Valas was wrongfully convicted by a non-unanimous jury because the district court erroneously declined to give a modified unanimity instruction after trial counsel preserved the issue for appeal. Since it was identified by this court as correct and clearly stronger than other issues raised on direct appeal that the direct panel had no problem dismissing out of hand, it's reasonably probable that this court would have granted relief had appellate counsel raised the issue. Well, but the court raised it sort of sua sponta, I guess, in a footnote, right? Yes, Your Honor. Included it was forfeited, or not preserved, and then basically declined to go any further, right? Well, not exactly, Your Honor. The panel concluded that it was not raised by appellate counsel, not that it was not preserved below. The direct appeal panel did not address the issue of whether the issue was preserved by trial counsel. Well, but so not raised by appellate counsel, but, I mean, we do have some discretion, do we not, to reach issues that are forfeited, or I guess not waived, but forfeited, if there's a miscarriage of justice, for example. So, if this is such a clear winner, how do you reconcile the court's treatment of this in a footnote with the argument that we're hearing today that this was key to the case? I mean, respectfully, Your Honor, appellate counsel failed to raise the issue, and this court is not particularly known to take up issues sua sponta that are not raised by the litigants. This court is more inclined to defer to the judgment of the litigants noted on direct appeal that appellate counsel waived the issue, but noted that there was a genuine risk that either there was juror confusion or, more importantly, that jurors may have concluded that Mr. Vallis committed different acts. Counsel, what's your best case with regard to what is necessary to preserve the objection to the omission of the instruction? I understand in this case, in other words, trial counsel did not submit a proposed jury instruction, and there's nothing that I've seen that suggests that that's an absolute requisite to preserve an issue. So, it's discussed apparently on the record. I know there's a colloquy. What is your best case for establishing that what occurred on the record was sufficient to preserve the issue? Yes, Your Honor. Thank you. United States v. Neal, 578, at 272, provides that it is sufficient if the trial counsel alerts the district court to the nature of the alleged error and provides an opportunity for correction. Then, in the Al-Saad case, 754, federal appendix at 250, where it was sufficient to raise the issue on the record during the charge conference, which is essentially what happened here. I'd also like to address the court's comment that trial counsel did not submit a proposed jury instruction. On the record, during the charge conference, trial counsel proposed language while he didn't submit a written request for a particular instruction. He said specifically, I'm very concerned about confusion and I'm very concerned about the jury making a determination where several think he did it on Tuesday, several think he did it on Monday, and that that's unacceptable under our law, and I object to that. He specifically objected. He then said, this jury needs to be told. They cannot convict Mr. Vallis for what happened on or what they believe if they find beyond a reasonable doubt that anything happened, and it was clear that he was referring in that situation to the second encounter. Upon clarification, the court made it very clear that his request was denied with respect to the language that he requested, and that's at the record 6584 and 85. So I understand the concern is that some jurors might have found that he committed offense on one day and others may have found that he committed the offense on the following day and that constituted the twelve. Is that the issue? Yes, Your Honor. That's the primary issue. Under this court's decisions in Hawley and Gibson and Bins, a modified unanimity instruction is constitutionally required where there's a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts. We have that genuine risk here, and it arises in a slightly different way than it often comes up. It arises first because of the way that the government indicted the case. The government indicted the case on or about January 6th, which in and of itself is not a problem. However, the way that they did it is that they had two separate encounters. I'll call the encounter that occurred on the 26th the first encounter, and then there was a later encounter alleged to have occurred the next day or the following day that I'll call the second encounter. When the government presented that evidence at trial, the government did not distinguish which was the charged count and which evidence it was bringing in only for 404B purposes. So right there you have a charge of one count on or about a particular date, evidence of two separate encounters where the government nor the court distinguished between which is the charged count and which is the 404B evidence, which provides in and of itself a genuine risk of juror confusion. However, it didn't end there. While we remain consistent that Mr. Vallis is innocent of the allegations on both encounters, I think it is inescapable that the allegations of the second encounter, the 404B encounter, is stronger than the evidence of the first encounter, and that's in a number of ways. First, during the first encounter, Mr. Vallis had at least a partial alibi for the first encounter. Secondly, we'll get to the phone records, but while the phone records were not used by trial counsel effectively to cross-examine the accuser, they were an evidence, as was a chart created by trial counsel's intern, which we will also get to, that did detail that on the 26th the accuser had been using two phones to talk and text during the time she locked herself in on direct. She testified on direct, I arrived at 9 o'clock. That text and call evidence was stronger on the 26th, whereas there was no chart or anything created for what was the 404B encounter. This risk was only compounded by the district court's instructions, the on or about instruction, where the district court said that the charge is that the offense was committed on or about a specific date, that the government does not have to prove the crime was committed on that exact date. It was further compounded by the similar acts instruction, which again did not distinguish which is the crime that was charged and which evidence constituted evidence of similar acts that the jury could only use for 404B purposes. Lastly, the government's confusion, and arguably the government sought to satisfy its burden to prove beyond a reasonable doubt the charge defense by double dipping. The government admitted in closing that it indicted on the 26th, and this is at 6682-66, I'm sorry, 6682-6683, but then went on to say, as long as you find that the acts, the criminal acts, plural, again contributing to the confusion, occurred reasonably near the date of the 26th, then that's good enough. Finally, three jurors asked to sleep on it before they returned to give their verdict. Those facts and evidence are sufficient under this court's precedent to establish that there was a genuine risk, I would argue, of juror confusion and that a conviction may have occurred because jurors thought that Mr. Vallis committed different acts. Therefore, as we've established, we believe because this issue is stronger than many of the issues that were raised on appeal, the Sienter argument that there was a case from this circuit, FIA, and a case out of the Second Circuit, Robinson, that had already denied that issue, the late disclosure issue, the defense got the evidence and used it. The alibi issue I mentioned was only a partial alibi and there's other weaknesses with the other issues. This court raised, recognized this issue. It's clearly stronger than some of the others raised. Therefore, it's reasonably likely that had appellate counsel raised this on direct appeal, this court would have granted relief. Let me ask you a question. You just used the phrase, kind of, clearly stronger. So, five years ago, Davila v. Davis, U.S. Supreme Court, 2017, I want to read you a sentence from that opinion. Declining to raise a claim on appeal is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court. Maybe I overlooked it. I don't see an argument in your brief why the unanimity instruction issue was plainly stronger than the other seven grounds that were raised on direct appeal. We use this court's language, I believe, in more that that was clearly stronger and I don't recall if we specifically set out each one in unison. I'm happy to do that here now. Give me your nutshell summary of why that instruction issue is plainly stronger than the other seven grounds that were raised on direct appeal. I'd start by saying this, Your Honor. This case is the case that Justice Scalia was concerned about in his concurrence in Shad, where he said we would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday. So, I'll start there. However, addressing each of the issues, the Sienta issue on direct appeal was a case in which there was a published opinion, but out of this court, Thea, that had denied the argument that the reasonable opportunity to view a portion of the statute was unconstitutional. There was a published opinion out of the Second Circuit that also denied that argument. This issue has strong case law in this circuit under Hawley and Bins and Gibson that a reasonably competent appellate counsel would have realized was stronger, especially as it was preserved. With respect to the late disclosure issue, like I said, trial counsel got the evidence and used it. So, the prejudice wasn't there. With respect to the alibi, it was a partial alibi, and that testimony regarding the alibi did get in the record. So, again, it was not nearly as prejudicial. The spoliation argument, bad faith is really hard to prove. That's a very difficult argument to make. And then, with respect to the rebuttal evidence and the prosecutorial misconduct, half of it was not preserved. So, a reasonable appellate, a reasonably competent appellate counsel would have recognized that this issue was stronger, perhaps not than all the issues raised on direct appeal, but many of them, if not most of them, and would have raised this issue, especially that the evidence of that is further that this court recognized it. Counsel, I know your time is running out. I wanted to ask you, with regard to the 302, did the agent who wrote the 302 testify? He did, Your Honor. And that 302 could also have been used to lock in that agent as to what the accuser told him that day. So, you're correct that it was material to cross-examine the two witnesses. Two witnesses, including the victim, the most important. That's right. That's right, Your Honor. And if you look at the statements, I'm sorry, that's the other issue. That is correct, Your Honor. Quickly, with respect to the vouching issue, I draw this court's attention to the similarities between the statements in this case and in Smith. And I'd be happy to answer any questions about cross-examination or anything else on rebuttal. All right, Ms. Spitzer, we'll see you back in a few minutes. Thank you. We'll reserve five minutes. Mr. Durbin for the United States. Take it away. Good afternoon. May it please the court. Thank you. I didn't get the memo. Well, to start with the unanimity issue, which is clearly of some concern to the court, the issue is whether or not appellate counsel was ineffective in failing to raise it. And in going through the analysis, we look through what the effect of having raised the objection might have been, whether or not the objection was properly raised and preserved. I read the record differently. I think that Mr. Convery spotted the issue and he mentioned it to the court, but his statement to the court was, I don't know how to fix this. It might be a problem with the indictment. Now, as far as the indictment is concerned, it was not facially duplicitous. It alleged an act on August 26th. And so it didn't allege either or. There was no suggestion of either or. The district court's instructions did not offer either or. And I think the arguments and I think the evidence, as we point out in the brief, was pretty clear that these were two events that were basically inextricably combined together. They were part and parcel of this series of events and they corroborated one another. And that's what the significance of the second event was. But as I read the testimony both of Mr. Vallis and of T.J., the victim, they were an all or nothing proposition. T.J. testified, she met with him twice, they had sexual relations twice, and she described them. There were discrepancies, but they weren't overwhelming discrepancies. They weren't of such a nature that it would appear that she's making this up out of full cloth. And Mr. Vallis said, no, I met with her, but I sent her away the first night. And she came back the second night, but I just wanted to interview her. I submit that there was no confusion among the jury as to a mix or match or pick your particular event. Those two stories came as a parcel. You either believed her or you believed him. And frankly, his testimony didn't make any sense. It just didn't make any sense that he was meeting with prostitutes in his hotel room for the purpose of interviewing them. And I don't think that this is a case, I think that this case, like the Tucker cases, is one where there was no genuine risk of confusion. To the extent that the panel, Judge Higginson's opinion, in that footnote recognized there may be an issue here. He did not say that there is a genuine risk. The footnote says there might be an issue here, but it hasn't been raised and we're not going to consider it. And there might have been an issue, but on this record, on this testimony, on these facts, there wasn't a genuine risk of confusion. And if you look at the arguments at the end of the day, the prosecutor's argument was based on August 26th event, that's where the focus was, the discussion was about the phone records on that date, and she didn't talk about the phone records to any extent on August 27th, and said the mere fact that she, T.J., shows up on the 27th the second time tells you that exactly what she says happened on the 26th happened on the 26th, and exactly what she says happened on the 27th happened on the 27th. And so the events of the 27th, the proof of that, they were combined, but they were interconnected, but they were not interchangeable. And in fact, those two events were very much important to Mr. Vallis' testimony because his testimony was, I was interviewing her, I made arrangements to interview her, he thought that that was an important event to his side of the story. And so it wasn't offered as a mix or match, and I would submit that the court's instructions that the court ended up giving came out of the exchange with Mr. Convery, 3599 to 3600, where Mr. Convery says, I'm concerned about confusion and so forth, I'm not exactly sure how the court needs to fix it, I think it's a problem with the way it was indicted, but they're like similar acts. And Convery turned to similar acts, and I think that's how this was used, that's what this evidence was about. And it goes on to say, but this jury needs to be told they cannot convict him for what happened on or what they believe. If they find beyond a reasonable doubt that anything happened, it could only be used to determine whether the event took place. Actually, that's a mistaken instruction. If that's what he was asking for, that's not what 404B evidence is about. 404B applies where the evidence can be considered, and the court instructed the jury this way, only if they find the event on the 26th occurred. And the court's instructions, and the court ended that colloquy with, well, that's the standard instruction, that's what you're asking for, and that's what the court gave. And then the court proceeded to give an honor about instruction, and you are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crime charged. And the crime charged was clearly in that count, August 26th. There's no reference to August 27th or 28th. The defendant is not on trial for any act, conduct, or offense not alleged in the indictment. And then the court gave dissimilar acts instruction. And so that was a proper instruction. And in terms of appellate counsel's choice in deciding what to raise on the direct appeal, part of the case was going to take some energy. This was going to take some litigation energy because there was a genuine question whether he had given up this particular objection. He spotted the issue, but he didn't preserve it. So it was going to, if he was to pursue that, it was going to go up on a plain error type standard. And as I submit to the court under these circumstances, the evidence was not confusing. The evidence presented a binary choice. You believe TJ or you believe Alice. Is there any corroborating evidence at all, physical corroborating evidence for either incident? For the sex act? Yes. Well, she was apprehended some days after this. There was a sane exam that was done. She had multiple sexual relations during a relatively short period of time. And there was no evidence to support that. But in so far as is there physical evidence, DNA, something like that, there was no evidence of that. What there was, was there was evidence that of the text messaging that went back and forth between them. There was Mr. Vallis's acknowledgement she was there both nights. And there was no dispute about whether or not he was there. And her testimony is not substantially contradicted by the other evidence. There's a lot of dispute over the phone records and whether Mr. Convery should have used those phone records in some way to cross-examine her. Mr. Convery, I think, had a strategy, and he described what it was. Well, he had a strategy maybe, but he didn't have a 302. Why was the 302 not turned over prior to either of the witnesses testifying, the agent, interviewing agent, or the victim? The prosecutor submitted an affidavit and said it was inadvertent, and missed it. But they're cross-examining two very important witnesses and he's going to say it's inadvertent? But the inconsistency in that report. Yeah, well, let me tell you, in the closing argument, as I said, because her story is indiscriminate and consistent, she has always been consistent and she has always been indiscriminate. At that point, he's vouching for the veracity of her testimony, which, to some extent or another, we can argue all day, you know, Monday morning quarterback, whether the 302 matched the testimony she gave. We know it didn't match precisely, but he didn't have the benefit of that to cross-examine her, and I asked you if there was any physical corroborating evidence. There's none. So, why would the government withhold such an important document as a 302 that could have been used for two different witnesses? Well, the inconsistency was she mentioned two meetings at the Hilton on that 302. Before you tell us that, before you tell us what the inconsistency is, answer my question. Why would the government withhold such a document? Why not just turn it over? Your argument today is it's not significant. Well, because at the end of the day, the decision for this court is was it material? Did it substantially affect the outcome? And so the government decided not material, not turning it over? Is that what you're telling me? I don't think so, Judge. Well, then why didn't they turn it over? That's my question. Because people make mistakes. Well, people make mistakes and people go to jail sometimes when mistakes are made. I understand that. He's entitled to a fair trial, but not a perfect trial. There was a mistake here, and if you look at what the inconsistency is, the report didn't make that much difference. The inconsistencies that would have been cross-examined about were in other documents already provided to the defense. And Mr. Convery chose not to pursue that line of examination. So this, first of all, didn't make any difference to what his strategy and tactics were in this particular instance. And second of all, there was information in the SANE exam, two meetings with the same client. There was information in her journal, which came . . . How often does the government not turn over 302s by mistake? Judge, I . . . I mean, a 302 is an interview of a witness, not all witnesses, not everyone you would turn over, but if someone testifies at a trial, a 302 is really important. I agree it's important. I'm not saying it's not. I'm saying . . . but the question here is . . . I'm not saying we . . . And you're talking about other evidence that the information was contained in other documents. It's a lot more significant if the witness tells an FBI agent, because of the ramifications of saying something false, which we're all familiar with, that version of events is pretty important, because it is told to an FBI agent. So it's . . . Well, she said in the SANE report that she met twice with the same client, which was disclosed. It was . . . it was offered into evidence. She told . . . or it was reported in a . . . based on a recorded interview with her in August, I think it was August 29th or something of . . . or 23rd,  and she told the FBI agent, the report says she recalls one out call to the Hilton. So she reported then one in an interview on February the 10th of 2014, which was the first part of this second 302. That interview was terminated, and she talked about the one incident, and it terminated before chronologically they got to that. So there's an explanation why it wasn't in the February 10 report. Then, in her journal, she describes two events, and describes them in detail, and she describes them almost the same as she did at trial. And Ms. Trevalos admitted she was there two times. It wasn't a question of whether she was there once or twice. That was undisputed. I'm not talking about . . . I'm not asking you about the testimony. There's a great deal of testimony that coincides between the defendant and the victim. We all know the text messages are indisputable. They both admit they were in the same place at the same times, roughly. But there's other information that it seems like the jury would be able to decide if it's immaterial, if the differences were immaterial as opposed to the government. Judge, I'm not defending the failure to disclose it. Please don't misunderstand me. I don't know why it wasn't. I take at face value the prosecutor's affidavit. It was a mistake. They had a lot of stuff. They had a lot of work to make in those things happen. The question is . . . Well, it just seems to me that had the document been provided, it would have been used on one or both of the witnesses involved, the agent who wrote the 302 and who heard her speak as well as the victim herself, and then the jury can sort through it and might well agree with you that, gee, this is, you know, a pile of nothing, and the jury can sort through it. But that particular report was a consistent statement with her trial testimony. How would that impeach her? A prior consistent statement wouldn't impeach her. It was the statements before that that were impeaching, and he had those. The defendant had those, and Mr. Convery didn't use them. He didn't impeach her with prior statements. What he did was, and this gets to the cross-examination issue as well, is he didn't know how she was going to respond to cross-examination, and she was 15, I think she was 16 at the time of the trial. He was concerned that he would get answers that he didn't know or wasn't anticipating, that it might appear that he was beating up on her. So what he did is, his strategy was similar to the strategy that Vallis suggests now, is contradict her on the phone records, because the time seems to be 10 o'clock, and I would, by the way, say, I don't think the record shows, I'm sorry, 9 o'clock. She was equivocal. She went along with 9 o'clock, but she didn't commit to that. In fact, the agent first thought it was 10 o'clock, and Mr. Convery brought him back to 9 o'clock because the strategy was to take those phone records because those were at a time where she did seem to be very involved, and it wasn't entirely consistent. Why would he not use it to cross-examine the agent who took her statement? Why would he not use the... If there were discrepancies in there, he could have gotten the agent to testify that the agent wrote the report, and the report contained information that didn't coincide with her testimony. Because he wasn't disputing that she was there two nights, because that was what Mr. Vallis's story was. There are other things in, sir, in the 302, there are other things in the 302 that are inconsistent with her testimony. Isn't that correct? They pertain to the use of a condom, and they pertain to matters of... Well, they're catalogued in the brief, and I'm sure counsel will talk about them on rebuttal. They're catalogued in the brief. The jury could have heard that and decided this doesn't amount to anything, or the jury could have heard it and said, you know what, what she said here in court isn't what she told the agent, and the agent testified based on his 302 what she said on that occasion. But Mr. Convery determined not to question her about the details of the sex, because his whole point was there was no sex. He didn't want to talk about it and deal with it, because the more you talk about it, the more it looks like there might have been sex. Now, was that a great strategy? I think it was a sensible strategy, because what he did was he took those phone records, he put in an exhibit, but he didn't question her about those. He used it for closing argument, when she couldn't respond, when she couldn't explain it, and his strategy was to pin her down on that, and it wasn't a question of whether or not she was there two nights. Mr. Vallis testified she was there two nights, and as I say, Mr. Convery, he didn't get into the details of the sex, and he didn't want to, I think because she was a 15-year-old girl, but I also suspect that's not a good line of questioning to get into those details if you're saying there wasn't any. His strategy was she didn't appear to be a minor and they had no sex. It wasn't a question of whether or not they were there, and that was the significance of Debt 302 for March of 2014 that was not disclosed, and as I say, I'm not defending the nondisclosure. What I'm saying is it wasn't material. It didn't affect the outcome. Yeah, it could have been relevant. Somebody might have used it. Another lawyer might have used it, but on this record, it wasn't material. That's what I'm suggesting in the report. On the issue of anything else you want to hear on that? On the issue of the vouching, I read those statements and I think that all of those issues, all of the statements that Mr. Barr made, the prosecutor, in the opening, he was, in context, he was talking about the evidence that supported her testimony. Why she was telling the truth. Why is she telling the truth? And he says because, and here's just a moment, because Barr went through it. So Barr went through it. So why is Key telling the truth? Because her story is indiscriminate and consistent. Her story is corroborated by physical evidence, and this goes to the answer to your question, Judge Engelhardt. There was a back page ad. There were AT&T phone records. There were calls from Mr. Vallis' phone records. There were registration records at the Hilton. There was the SANE report. And she had her journal and she described in detail the circumstances. And Mr. Vallis even agreed with a lot of these things up to the point of whether or not he had sex with her or whether he was interviewing her. And I read Barr's closing argument to be saying, well, the first statement is true. It is true. She's telling the truth. I think that was a response to Mr. Connery's opening statement. It's not true. It's not true. It was hyperbole. It was a rhetorical device. He wasn't vouching for her credibility based on his position, because he goes on to say, here's how TJ is telling the truth, and he discusses it. Why is she telling the truth? Because. Why would she lie? Why would she make this up? The judge basically instructs, you should ask yourselves, what are the motivations for the witness? And that's what his argument was about. My time is up, and I will sit down. Thank you very much. Mr. Berman, thank you very much. Ms. Spencer, we're back to you for rebuttal. Thank you. Thank you, Your Honor. I'd like to start with, briefly, because we tread a lot of ground on the unanimity issue when I was here before, but my learned brethren mentioned that the way that the evidence was presented, the issues that the encounters were inextricably combined, I believe he said, that in and of itself is the issue. The court's similar acts instruction said the crime, but did not distinguish between the charged crime and the evidence that could only be used for similar acts. Similarly, when counsel on the other side said that the testimony of Mr. Vallis didn't make sense, I'd like to jump from there to the cross-examination issue because the plausibility, the facial plausibility of the defense, that it was hard to defend, or as the government says, that it was deeply flawed, or his barber, actually makes it clear that a competent trial attorney had to use laser-like cross-examination using the only available objective, uncontested, exculpatory documents that confirm that what she claims happened did not happen the way that she said it did. Had trial counsel used the phone records and to that point, I'd like to correct the record as well, the accuser did lock in on direct in response to a question by attorney Richardson, AUSA Richardson, she testified on direct, quote, that she arrived at 9 o'clock, and that is at ERA 6278. That locked her in, which was corroborated both by Mr. Vallis' testimony, but more importantly, by a text message at 856, where she asked Mr. Vallis, what's your room number? Had trial counsel hemmed her in with, instead of, did you arrive at 9 o'clock? You testified on direct that you arrived at 9 o'clock. Let's look at the phone records, and you jump right there. There is no dispute, those phone records, even the district court acknowledged, were uncontested. You walk her through respectfully, no bullying, as opposed to the questions he did ask her three times about her suicide attempt. You want to talk about bullying, or getting the jury to have sympathy for a clearly very troubled young woman who, yeah, got in trouble at school, so what? Who was a 15-year-old girl who fought with her mother, so what? These are peripheral issues. The government's case hung on the credibility of the accuser, and the only evidence trial counsel had available to demonstrate that her allegations were factually untrue was to put the image in the jury's mind that she was talking and texting on two phones like a modern-day Rosemary Woods while she was allegedly having graphic sexual encounters with my client. Talk about implausible. That's ridiculous. You have to put that image in the jury's mind, however, to undermine, to inject reasonable doubt, to undermine the credibility of her allegations and of her narrative, which goes to the Brady claim, briefly, that there is no requirement. Whether something was strategically used or not is not a requirement under Brady. That's Strickland. Brady, that there is no requirement for the petitioner or would have used that evidence. It's cumulative. Had that been disclosed, Judge Engelhardt, as you pointed out There's a difference, though, between whether it's Brady in the exculpatory sense or whether it's just grist for the cross-examination mill, though, isn't there? You're jumping to the Brady level, and I understand that's your argument in your brief. My questioning of counsel was more pertinent to the ability to use the document to cross-examine on an inconsistency. Yes, Your Honor. I agree with that completely. And talking about the inconsistencies, as you pointed out, this 302, March 10th, one, was not a continuation as such of the February 10th 302. If you look at the 302s carefully, they are not chronologically, they don't match up. In the February 10th 302 that was disclosed, where she only mentioned one out-call, which was consistent with her statement on August 29th, the day after this allegedly occurred, when she got picked up, she told the San Antonio police she had one out-call. That is clearly a materially inconsistent statement as are the others. We have your argument. We appreciate it. Thank you very much. Thank you, Your Honor. Thank you both. The case is submitted.